UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 04-3069(DSD/SRN)

Jeremy Parker,

       Plaintiff,

v.                                                              **ORDER**

Time Warner Cable, Inc.,

       Defendant.


    William B. Butler, Esq., 33 South Sixth Street, Suite 4100, Minneapolis, MN 55402, counsel for plaintiff.

    Eric J. Pelton, Esq., Robert B. Brown, Esq. and Kienbaum, Opperwall, Hardy & Pelton, 280 North Old Woodward Avenue, Suite 400, Birmingham, MI 48009 and Frederick E. Finch, Esq., Matthew J. Franken, Esq. and Bassford Remele, P.A., 33 South Sixth Street, Suite 3800, Minneapolis, MN 55402, counsel for defendant.


    This matter is before the court upon the motion of defendant Time Warner Cable, Inc., for summary judgment. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants defendant's motion.


**BACKGROUND**

    In this diversity action, plaintiff Jeremy Parker alleges that his employer, defendant Time Warner Cable, Inc., retaliated against him for seeking workers' compensation benefits and for filing a charge of disability discrimination with the Minnesota Department

of Human Rights ("MDHR"). Defendant is a provider of cable television service. It hired plaintiff as a construction technician on September 17, 2001. On May 8, 2002, plaintiff climbed a twenty-foot ladder to reach an outdoor cable. Plaintiff fell from the ladder and landed on a wrought-iron table, causing injury to his back. Plaintiff reported the accident to his supervisor, Joe Brownrigg, who drove plaintiff to a clinic for evaluation. Plaintiff was treated and released.

The next morning, plaintiff visited his personal physician. The doctor imposed restrictions requiring no work until May 13, 2002, followed by light duty for three days and a return to regular duty. Plaintiff complied with these restrictions and returned to light duty work on May 13. The day he returned, plaintiff presented Brownrigg with a claim for workers' compensation benefits. Brownrigg signed off on the claim and forwarded it to defendant's human resources department for processing. Plaintiff resumed regular duty after May 15, but returned to his physician when he experienced stiffness and back pain. The doctor limited plaintiff to moderate duty, imposing a lifting restriction of no more than forty pounds. Plaintiff adhered to this restriction throughout the summer of 2002, and Brownrigg found light duty assignments for plaintiff to do.

One of plaintiff's temporary assignments was to chauffeur an engineering technician who had lost his driver's license. As

plaintiff drove the technician around, he began to master the technician's job of surveying cable routes and estimating costs for new installations with commercial clients. Eventually, Brownrigg assigned some surveys directly to plaintiff. Meanwhile, defendant created a new position, entitled Business Services Survey Specialist ("BSSS"), that incorporated the survey function being performed in part by plaintiff. Brownrigg encouraged plaintiff to apply, which he did on July 10, 2002. Plaintiff was interviewed by Business Services Field Administrator Joe Thill on September 23, 2002. Thill offered plaintiff the BSSS job three days later.[1] Plaintiff accepted on September 26, and was told to report on Monday morning, September 30, 2002.

When Monday arrived, plaintiff arose from his bed, felt his legs go numb and "fell right flat on [his] face." Plaintiff telephoned Brownrigg and Thill to tell them that he would be unable to come to work. Plaintiff then called his doctor, who instructed him to remain off work for two days. After examining plaintiff, the doctor extended the restriction through Friday, October 4, 2002. The following Monday, plaintiff visited a specialist from the Mayo Clinic, Dr. Grogg, who advised plaintiff not to work until after his next appointment. Plaintiff next saw Dr. Grogg on

---

[1] Defendant contends that Thill never offered plaintiff the BSSS position.

October 15, 2002.[2]  At that appointment, the doctor released plaintiff for work with restrictions.

Shortly after Thill learned on September 30 that plaintiff had again hurt his back, he sent an email to his supervisor, Matt Feyen, and human resources employee Jason Stobba.  (Pl.'s Ex. 34.) The e-mail suggested new, stricter physical qualifications for the BSSS position.  Thill also made the following observations:

> Jason, during the interview I conducted with Mr. Parker I specifically asked about his back injury and the ability to perform this position.  The response was that it would not be a problem as he was at the time performing most of the functions.  My concern is that the back injury has indeed become an issue and will directly affect his ability to perform.

(Pl.'s Ex. 34.)  On October 6, 2002, defendant posted an advertisement stating that the BSSS position was open.  Cary Schmidt applied the next day.  Thill interviewed Schmidt on October 11.  Schmidt returned for a second interview, this time with Feyen, on October 14.  At the end of the interview, Feyen offered Schmidt the position, and he accepted.  Schmidt began work in the BSSS position on October 21, 2002.

Plaintiff asserts that, after Dr. Grogg released him for work on October 15, he telephoned Stobba.  Stobba told plaintiff that

---

[2] In his brief, plaintiff asserts that he saw Dr. Grogg "on or about October 14, 2002."  (Pl.'s Mem. Opp'n at 9.)  In his deposition, however, plaintiff testified that he saw the doctor on a Tuesday.  (Parker Dep. at 72.)  That means the visit would have taken place on Tuesday, October 15, 2002.

4

the physical requirements of the BSSS position had been revamped. Plaintiff communicated the new requirements to Dr. Grogg, who revised plaintiff's restrictions to comply. Plaintiff advised Stobba of Dr. Grogg's response, and Stobba asked plaintiff to come in on October 22, 2002, for a meeting. At the meeting, plaintiff was instructed to see defendant's company doctor. Plaintiff went to see that doctor on November 21, and the doctor concurred with Dr. Grogg's conclusion that plaintiff was capable of fulfilling the new physical requirements of the BSSS position. Defendant informed plaintiff on November 27, 2002, that the BSSS position had been filled by Schmidt.

From the fall of 2002 until the summer of 2003, plaintiff was placed on leave and paid full workers' compensation benefits. During that time, defendant e-mailed him notices of job openings. In June 2003, plaintiff returned to work briefly in a warehouse position where he tested cable modems. Plaintiff's pay was equal to that he initially received as a construction technician. When the bending, stooping, kneeling and reaching required by the position aggravated plaintiff's back, plaintiff returned to Dr. Grogg. The doctor took plaintiff off of work, and plaintiff returned to paid leave status.[3]

---

[3] The same day Dr. Grogg instructed plaintiff not to work, plaintiff applied for a business development representative position. In view of defendant's inability to perform the modem testing job, however, defendant concluded that plaintiff could not
(continued...)

Defendant learned in August 2003 that plaintiff had accepted employment with another company. Stobba wrote plaintiff to inform him that, if he did not confirm his intention to return to work, defendant would take it that he had voluntarily resigned. Plaintiff's counsel responded on his behalf and denied that plaintiff had resigned. Defendant continued to notify plaintiff of job openings. On September 2, 2003, plaintiff applied for an engineering technician position, but failed to win the position due to his lack of experience and inability to fulfill "on-call" responsibilities from his home in Wisconsin. On October 21, 2003, plaintiff filed a charge of disability discrimination with the Equal Employment Opportunity Commission and MDHR.

On December 19, 2003, defendant offered plaintiff a job in its communication center at his construction technician rate of pay. Defendant instructed plaintiff to report on January 5, 2004, or be deemed to have resigned. Plaintiff responded seeking more information about the position. Defendant answered plaintiff's query on January 14, 2004, and asked him for current medical information. Defendant also instructed plaintiff to report for work, either in his old construction technician position or in the communication center, by January 26, 2004. Plaintiff's counsel

---

[3](...continued)
meet the physical requirements of the business development position. Accordingly, defendant did not interview plaintiff for the position.

6

responded requesting more time, and defendant extended the deadline until February 11, 2004.  Plaintiff did not return to work on that date, and defendant concluded that he had resigned.

Plaintiff filed this lawsuit on June 29, 2004.  Defendant now moves for summary judgment.

## DISCUSSION

### I. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the non-moving party. See id. at 255. The non-moving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23.

**II.   Workers' Compensation Retaliation Claim**

    **A.   Prima Facie Case**

Plaintiff first claims that defendant retaliated against him for seeking workers' compensation benefits. The court applies the familiar three-part McDonnell Douglas analysis to plaintiff's claim. Benson v. Northwest Airlines, Inc., 561 N.W.2d 530, 539 (Minn. Ct. App. 1997) (citing McDonnell Douglas v. Green, 411 U.S. 792, 802-05 (1973)). First, plaintiff must establish a prima facie case of retaliation. See id. at 539. To establish a prima facie case of workers' compensation retaliation, plaintiff must show (1) that he engaged in statutorily-protected conduct, (2) that he suffered an adverse employment action and (3) a causal connection between the two. Kunferman v. Ford Motor Co., 112 F.3d 962, 965 (8th Cir. 1997) (citing Dietrich v. Canadian Pac. Ltd., 536 N.W.2d

319, 327 (Minn. 1995)). If plaintiff succeeds, the burden of production shifts to defendant to articulate a legitimate reason for its actions. See Benson, 561 N.W.2d at 539. If the defendant identifies such a reason, the burden returns to plaintiff to show that the reason is really a pretext meant to obscure unlawful retaliation. See id. at 539.

Plaintiff has failed to establish a prima facie case. First, plaintiff has failed to show that he was subjected to adverse employment action within the scope of the Minnesota workers' compensation retaliation statute. That statute, unlike the Minnesota Human Rights Act, does not prohibit all actions that materially affect the terms, conditions and privileges of employment. Compare Minn. Stat. § 176.82 (workers' compensation retaliation), with Minn. Stat. § 363A.08, subd. 3 (MHRA) (prohibiting discrimination in "hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment"). Rather, an employer commits workers' compensation retaliation only when it discharges or threatens to discharge an employee, unreasonably refuses to offer the employee work that is available within the employee's physical limitations or

intentionally obstructs the employee from collecting benefits.[4] See Minn. Stat. § 176.82.

Plaintiff argues that defendant's refusal to place him in the BSSS position constitutes an actionable adverse employment action. Plaintiff points to evidence that Thill manipulated the physical requirements of the position for the purpose of excluding plaintiff. Thill's actions are ultimately irrelevant, however, because the BSSS position was not available by the time plaintiff's doctor cleared him to return to work. Nothing in the Minnesota statute obligated defendant to hold the BSSS position open when plaintiff was unable to come to work on September 30. Plaintiff was not prepared to return to work on any basis until he was cleared by Dr. Grogg on October 15, 2002. By then, defendant had filled the BSSS position.[5] Therefore, because the BSSS position was not available, defendant was not obligated to place plaintiff in it, and its failure to do so does not constitute adverse action under Minnesota Statute § 176.82.

---

[4] An employer "intentionally obstructs" an employee from collecting benefits when it causes "'some actual denial or disruption in the receipt of benefits.'" Summers v. R & D Agency, Inc., 593 N.W.2d 241, 244 (Minn. Ct. App. 1999) (quoting Flaherty v. Lindsay, 467 N.W.2d 30, 32 (Minn. 1991)). Plaintiff does not dispute that he received all the workers' compensation benefits that were due him.

[5] Although plaintiff points out that his replacement's first day on the job was not until October 21, he does not dispute defendant's assertion that the replacement accepted the position, conditioned on a successful drug test, on October 14.

Moreover, although plaintiff has apparently abandoned the theory in the briefing of defendant's motion, plaintiff cannot sustain his claim that he was constructively discharged. (See Compl. ¶ 11.) "'A constructive discharge occurs when an employee resigns in order to escape intolerable working conditions caused by illegal discrimination.'" Navarre v. S. Washington County Sch., 652 N.W.2d 9, 32 (Minn. 2002) (quoting Cont'l Can Co. v. State, 297 N.W.2d 241, 251 (Minn. 1980)). Plaintiff generally asserts that defendant "attempted to force [him] to resign by compelling him to accept temporary positions wholly unrelated to his education and experience and involving dirty, manual labor and repetitive tasks." (Pl.'s Mem. Opp'n at 4, 21.) Plaintiff, however, fails to address with specificity what those positions entailed and how they would have subjected him to intolerable conditions.[6] Plaintiff has thus failed to establish a genuine issue of material fact regarding constructive discharge.

Second, even if defendant's refusal to place him in the BSSS position constituted adverse action, plaintiff has failed to demonstrate a causal connection between that refusal and his claim for and collection of workers' compensation benefits. Plaintiff

---

[6] Plaintiff cites only two examples of the "dirty, manual labor" defendant allegedly offered him: answering phone calls in the Time Warner call center and cleaning used cable boxes. (Pl.'s Mem. Opp'n at 12.) Plaintiff does not explain why answering the phone is either dirty or manual. Nor does he explain why Time Warner's used cable boxes are so dirty as to be considered intolerable.

points to the fact that Thill moved immediately after plaintiff's September 30 re-injury report to change the physical qualifications for the BSSS position. However, a brief span of time between protected activity and adverse action is not alone sufficient evidence of causation. Kunferman, 112 F.3d at 965. To bolster his claim, plaintiff points to the content of an e-mail Thill sent to Stobba. Plaintiff asserts that the e-mail reveals Thill's intent to exclude him from the position in retaliation for his workers' compensation claim.

Plaintiff's argument fails because neither the e-mail nor anything else in the record demonstrates that Thill knew of plaintiff's workers' compensation claim or its status. For a particular adverse action to constitute retaliation, the person undertaking the action must be aware of the plaintiff's protected activity. See Kunferman, 112 F.3d at 965. The e-mail cited by plaintiff makes no mention of workers' compensation. It indicates only that Thill's "concern is that the back injury ... will directly affect [plaintiff's] ability to perform." (Pl.'s Ex. 34.) When viewed in the light most favorable to plaintiff, this statement does not support an inference that Thill was motivated by plaintiff's claim for workers' compensation benefits. Rather, the e-mail means what it says - Thill worried that plaintiff's back injury had rendered him unable to carry out the duties of the BSSS position. Plaintiff similarly fails to offer any evidence that

12

Feyen, the other person responsible for the BSSS hiring process, was motivated by plaintiff's workers' compensation claim. Therefore, plaintiff has failed to make out a prima facie case of workers' compensation retaliation, and summary judgment is appropriate.

### B.   Defendant's Legitimate Reason and Pretext

Assuming, however, that plaintiff had established a prima facie case, defendant would nonetheless be entitled to summary judgment. Defendant has asserted that plaintiff was denied the BSSS position because he was physically unable to report for his first day of work and that, by the time he regained the ability to report, the position had been filled. If defendant's action was indeed motivated by those reasons, defendant did not violate the workers' compensation retaliation statute. See supra II.A. Therefore, the burden shifts to plaintiff to show that defendant's reason is a pretext designed to obscure workers' compensation retaliation. See Benson, 561 N.W.2d at 539.

Plaintiff has failed to show that defendant's asserted reason was pretext. For reasons the court has already discussed, plaintiff's evidence is insufficient to create a genuine issue of material fact whether defendant's actions were motivated by his claim for workers' compensation benefits. Summary judgment is therefore appropriate.

**III. MHRA Reprisal Claim**

Plaintiff's second claim is that defendant retaliated against him for filing a charge of disability discrimination with the Minnesota Department of Human Rights ("MDHR"). To establish a prima facie case of reprisal under the MHRA, plaintiff must show (1) that he engaged in statutorily-protected conduct, (2) that defendant subjected him to adverse employment action and (3) a causal connection between the two. Fletcher v. St. Paul Pioneer Press, 589 N.W.2d 96, 101-02 (Minn. 1999) (quoting Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 444 (Minn. 1983)).

Plaintiff has failed to demonstrate that any adverse employment action taken by defendant was linked to his having filed a claim with the MDHR. Plaintiff apparently contends that defendant refused to hire him in July 2003 "when Time Warner's workers compensation insurer contacted him to inform him that he was to start looking for outside work."[7] (Pl.'s Mem. Opp'n at 24.) Plaintiff did not file his charge of discrimination until October 21, 2003. (Def.'s Ex. 42.) Defendant's refusal to hire plaintiff

---

[7] Plaintiff identifies no other adverse action in his discussion of the reprisal claim. (See Pl.'s Mem. Opp'n at 23-24.) Elsewhere, plaintiff generally alleges that defendant denied his last application for employment in January 2004. (Id. at 12.) Plaintiff, however, offers no evidence of any causal link between such denial and his having filed a charge of discrimination the previous October.

in July 2003 cannot possibly have been caused by plaintiff's *subsequent* charge of discrimination in October 2003. Defendant is therefore entitled to summary judgment.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Doc. No. 13] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 6, 2005

                                        s/David S. Doty
                                        David S. Doty, Judge
                                        United States District Court